**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| | : | |
| CALVIN RIGGINS, | : | CIVIL ACTION NO. 07-4860 (MLC) |
| | : | |
| Plaintiff, | : | **MEMORANDUM OPINION** |
| | : | |
| v. | : | |
| | : | |
| SGT. MARTIN HORVATH, et al., | : | |
| | : | |
| Defendants. | : | |
| | : | |

**COOPER, District Judge**

Plaintiff brought this action pursuant to 42 U.S.C. §
("Section") 1983 against defendants Martin Horvath, Jason Muller,
and Joseph Quinn (collectively, "defendants"), and two
indeterminate employees of the Jamesburg Police Department, named
in the Complaint as John Doe and Jane Doe, seeking to recover
damages for, <u>inter alia</u>, alleged violations of the Fourth and
Fourteenth Amendments of the United States Constitution.  (Dkt.
entry no. 1, Compl.)

The Court dismissed the Complaint as to the John Doe and
Jane Doe defendants for failure to state a claim on November 29,
2007.  (Dkt. entry no. 2, 11-29-07 Order at 3.)[1]  The Court held

---

[1] The Court dismissed the allegations, which were limited to
a claim of "official police misconduct," because the plaintiff
provided no factual support for the claim, but permitted the
plaintiff to file an amended complaint addressing such
deficiencies.  (11-29-07 Order at 3 n.2.)  However, the Amended
Complaint (dkt. entry no. 8) omitted John Doe and Jane Doe
entirely and did not address any "official police misconduct" of
the unidentified police officer nor the unidentified female

that the plaintiff's allegations suggesting an Equal Protection claim under the Fourteenth Amendment did not amount to a claim upon which relief could be granted, but allowed the plaintiff's Fourth Amendment excessive force claim and Fourteenth Amendment denial of medical care and excessive force claims to proceed. (Id. at 2 n.1.)  The Court granted the plaintiff leave to file an amended complaint, which he did on December 28, 2007.  (Dkt. entry no. 8, Am. Compl.)  The Court will deem the Amended Complaint to include the relevant allegations against Horvath, Muller, and Quinn found in the Complaint.[2]

The defendants now separately move for summary judgment in their favor pursuant to Federal Rule of Civil Procedure ("Rule") 56.  (Dkt. entry nos. 70 (Muller's Mot. for Summ. J.), 71 (Quinn's Mot. for Summ. J.), 72 (Horvath's Mot. for Summ. J.).) The plaintiff opposes the separate motions.  (Dkt. entry no. 89,

---

police department employee who did nothing to stop the alleged assault on the plaintiff at police headquarters.  (See Compl. 3-4.)

[2] The Amended Complaint re-states the same factual allegations as to racial discrimination made in the Complaint, and therefore suffers from the same defects the Court noted in dismissing the plaintiff's putative Equal Protection claim in the first instance.  (11-29-07 Order at 2 n.1.)  Accordingly, the plaintiff's Equal Protection claim will be dismissed for failure to state a claim upon which relief can be granted.

Pl.'s Aff. of Truth ("Pl.'s Aff.") and Pl.'s Br. Supp. Mot. Opp'n Summ. J.)[3]

After briefing on the defendants' separate motions for summary judgment was complete, the plaintiff submitted a "Notice of Proposed Pleadings of Plaintiff Calvin Riggins to Amend Complaint Pursuant to Local Civil Rule 7.1" ("Seventh Motion to Amend").  (Dkt. entry no. 93.)[4]  The defendants oppose this motion.  (Dkt. entry nos. 79, 94.)

The Court determines these matters on briefs without an oral hearing, pursuant to Rule 78(b).  For the reasons stated herein, the Court will (1) deny the plaintiff's Seventh Motion to Amend, (2) dismiss without prejudice the plaintiff's Fourth Amendment excessive force claim against Muller pertaining to the

––––––––––––––––––––

[3] The plaintiff designated the opposition to the defendants' separate motions for summary judgment as a "motion," but the Court construes it as a response to the defendants' separate summary judgment motions.  (Dkt. entry no. 89.)
The plaintiff's opposition includes a request "for a continuance to conduct discovery," which the Court construes as a motion under Rule 56(f).  (Pl.'s Aff. at ¶ 9.)  An affidavit in support of a Rule 56(f) motion must specify "what particular information is sought; how, if uncovered, it would preclude summary judgment; and why it has not been previously obtained." Dowling v. City of Philadelphia, 855 F.2d 136, 139-40 (3d Cir. 1988).  The plaintiff's affidavit asserts only that he had difficulty obtaining his legal documents after being transferred to a different institution, not that he seeks additional discovery from the defendants.  (Pl.'s Aff. at ¶¶ 2-7.)  The Court will deny the plaintiff's Rule 56(f) motion.

[4] This filing represents the plaintiff's seventh attempt to amend the Complaint since he filed the Amended Complaint.  (See dkt. entry nos. 45, 52, 54, 60, 64, and 65.)

3

plaintiff's arrest, pursuant to <u>Heck v. Humphrey</u>, 512 U.S. 477 (1994), and (3) grant in part and deny in part the defendants' separate motions for summary judgment as to the plaintiff's remaining claims.

**BACKGROUND**

## I.   Arrest by Horvath and Muller

Shortly before 5:00 a.m. on the morning of November 7, 2006, a resident of Jamesburg, New Jersey ("the resident") called the Jamesburg Police Department to report a suspicious person in the backyard of his neighbor's home. (Dkt. entry no. 70, Certification and Filing of William T. Connell ("Connell Cert."), Ex. K, Call for Service Details.)  The resident advised the police dispatcher that the suspicious person had fled when the resident attempted to speak to him. (Connell Cert., Ex. EE, Resident Aff. at ¶ 15.)  Muller, a patrolman with the Jamesburg Police Department, responded to the resident's home. (<u>Id.</u> at ¶¶ 1, 16.)  The resident was standing on the sidewalk in front of his home, and advised Muller he had observed a black male in the backyard of his neighbor's home. (Connell Cert., Ex. T, Muller's Answer to Pl.'s Interrog. No. 2; Resident Aff. at ¶ 17.)

Muller drove around the area and observed a person on the front porch of another house around the corner from the resident's home. (Connell Cert., Ex. Z, Narrative/Continuation Report of Muller.)  Muller exited his patrol car, placed a

4

spotlight on the plaintiff, and asked him to come off the porch. (Id.; Connell Cert., Ex. O, Riggins Dep. 216:10-217:20.)  The plaintiff complied with this request and walked toward the officer.  Muller recognized the person as the plaintiff, Calvin Riggins, whom he had known for approximately ten years. (Muller's Answer to Pl.'s Interrog. No. 2.)  Muller advised the plaintiff to place his hands on his head in order for Muller to pat him down. (Narrative/Continuation Report of Muller.)  Muller asked the plaintiff what he was doing on the porch.  (Riggins Dep. 226:11-12.)  The plaintiff responded that he was visiting a friend, and had to leave for work.  (Riggins Dep. 226:10-15, 23-24.)

As Muller was patting down the plaintiff, the plaintiff ran away into the backyard of the house.  (Muller's Answer to Pl.'s Interrog. No. 2.)[5]  Horvath, then a sergeant with the Jamesburg Police Department, arrived on the scene as a brief foot chase began, and aided Muller in pursing the plaintiff.  (Id.)  Horvath

_____

[5] The plaintiff contends that he ran away because, after the pat-down occurred and he turned to leave, Muller struck him in the back of the head with either a fist or his flashlight. (Riggins Dep. 228:5-6, 235:23-25, 242:1-23.)  For reasons discussed infra, this discrepancy in the parties' versions of events is immaterial in this case due to plaintiff's conviction for the aggravated assault of Muller.  See Ference v. Township of Hamilton, 538 F.Supp.2d 785, 789 (D.N.J. 2008) (stating exception to usual summary judgment standard in that, in accordance with Heck v. Humphrey, "the Court will not draw inferences in Plaintiff's favor that would necessarily negate" the plaintiff's underlying criminal conviction).

and Muller pursued the plaintiff through the backyard of the house and into the resident's backyard.  (Riggins Dep. 118:7-14.) The officers commanded the plaintiff to stop, and Muller threatened to shoot the plaintiff if he continued running. (Riggins Dep. 120:14-17; 242:21-25.)  The officers eventually apprehended the plaintiff on the driveway of the resident's home.

The officers slammed the plaintiff into the ground, face first, and "pounced" on him.  (Riggins Dep. 124:23-25, 125:8.) Horvath had his knee in the plaintiff's back.  (Riggins Dep. 125:18-21.)  As Muller and Horvath attempted to handcuff the plaintiff, the plaintiff resisted, kicking at Muller and trying to bite Horvath's hand.  (Connell Cert., Ex. AA, Narrative/Continuation Report of Horvath.)  Horvath noticed that the plaintiff's hand was clenched around something as he attempted to handcuff the plaintiff.  (Connell Cert., Ex. U, Horvath's Answer to Pl.'s Interrog. No. 1.)  The plaintiff screamed that he could not breathe.  (Riggins Dep. 126:11-12.)

The plaintiff testified that the officers assaulted him, kicking and punching his arms, legs, side, and head, for about thirty seconds before handcuffing him, and for about three minutes after he was handcuffed.  (Riggins Dep. 129:11-22, 131:4-23.)  Both officers deny beating the plaintiff, although they do admit they used constraint holds because the plaintiff was resisting arrest.  (Horvath's Answer to Pl.'s Interrog. No. 1;

6

Connell Cert., Ex. CC, Muller Use of Force Report; Connell Cert.,
Ex. DD, Horvath Use of Force Report.)   The resident asserts in
his sworn statement that he observed the entire incident and did
not see Horvath or Muller "hit, strike, kick or knee" the
plaintiff.  (Resident Aff. at ¶ 27.)

The officers ultimately handcuffed the plaintiff.  Muller
injured his hand during the struggle.  (Muller's Answer to Pl.'s
Interrog. No. 20.)   A plastic bag lay broken underneath the
plaintiff, which Horvath believed the plaintiff to have been
concealing in his clenched hand during the struggle, and a white
powdery substance was spread on the immediate area and the
officers' and plaintiff's clothing.  (Horvath's Answer to Pl.'s
Interrog. No. 1; Muller's Answer to Pl.'s Interrog. No. 2.)
Muller searched the plaintiff's pockets, and discovered another
bag of cocaine; a folding knife, which the plaintiff did not
brandish during the encounter; and a large amount of cash.
(Narrative/Continuation Report of Muller; Muller's Answer to
Pl.'s Interrog. No. 2.)

Because Horvath and Muller's respective patrol vehicles were
not readily accessible, they requested assistance from the Monroe
Township Police Department in transporting the plaintiff to the
Jamesburg police headquarters.  (See Connell Cert., Ex. FF,
Silvestri Aff. at ¶ 4.)   A member of the Monroe Township Police
Department transported the plaintiff in his vehicle to the

7

Jamesburg police headquarters.  He states that while the
plaintiff was in his custody, he observed no injuries to the
plaintiff, and the plaintiff did not complain of injuries or
request medical attention.  (Silvestri Aff. at ¶¶ 6-8.)

## II.  Detention at Jamesburg Police Headquarters

### A.  Alleged Strip Search/Assault

Quinn, a patrolman with the Jamesburg Police Department, was
not involved in the arrest of the plaintiff, but was present at
the police headquarters when the plaintiff arrived.  At the
police headquarters, the plaintiff refused to cooperate with the
officers' attempts to process him.  (Connell Cert., Ex. V,
Quinn's Answer to Pl.'s Interrog. No. 2; Muller's Answer to Pl.'s
Interrog. No. 2.)

The plaintiff alleges that he was placed in a holding cell,
then beaten by Horvath, Muller, and Quinn during a "holding cell
- extraction" wherein "the[] defendants sought to strip search
plaintiff for a cavity search." (Compl. at 7, 10, 11.)  The
plaintiff's interrogatory answers state that Horvath initiated a
body cavity search and the three defendants began to strip him of
his clothing, which he resisted.  The plaintiff avers that

> while at police headquarters Martin Horvath dragged
> Plaintiff out of the holding cell by his limbs aided by
> co-defendants.  Plaintiff was fearful of being
> sodomized by Martin Horvath: did in fact put up a
> struggle.  That is when the series of blows were
> inflicted upon Plaintiff by Martin Horvath and co-
> defendants.

(Connell Cert., Ex. M, Pl.'s Answer to Horvath's Interrog. No. 7.)   The plaintiff further claims that the defendant officers "continued to stomp, kick[,] punch and twist plaintiff['s] limbs."  (Connell Cert., Ex. L, Pl.'s Answer to Muller's Interrog. No. 12; see also Connell Cert., Ex. N, Pl.'s Answer to Quinn's Interrog. No. 7 (stating that Quinn "held plaintiff down to be assaulted at Jamesburg police headquarters").)

The plaintiff's "Affidavit of Truth" in opposition to the defendants' separate motions for summary judgment makes no mention of an attempted strip search at the police headquarters, stating only that "Martin Horvath, Jason Muller and Joseph Quinn had no cause to use force on plaintiff at police headquarters after plaintiff had been in custody in a holding cell."  (Pl.'s Aff. at 5.)   Muller denies that he was involved in any alleged strip search of the plaintiff.  (Muller's Answer to Pl.'s Interrog. No. 9.)   Quinn asserts that "nothing occurred in the jail cell other than Riggins yelling and threatening the officers.  There was no physical altercation at headquarters." (Quinn's Answer to Pl.'s Interrog. No. 2.)   Horvath simply states, "No force was used against the Plaintiff at Jamesburg Police Headquarters."  (Horvath's Answer to Pl.'s Interrog. No. 1.)   He adds that the plaintiff "was uncooperative and unruly" while detained at the police headquarters and while escorted to a patrol vehicle for transport to the Middlesex County Adult

Corrections Center ("MCACC").  (Horvath's Answer to Pl.'s Interrog. No. 11.)

**B.   Complaints of Injury and Denial of Medical Care**

The plaintiff contends that he "repeatedly complained that he was hurting and was in pain.  No one in Jamesburg police headquarters came to plaintiff['s] aid.  Plaintiff remained in the holding cell for at least two hours with a bloody nose, pain in my both sides of my back and ribs."  (Pl.'s Answer to Horvath's Interrog. No. 11.)  He testified at his deposition that he asked "all the officers who were present," including the three defendants here, for medical treatment while at police headquarters.  (Riggins Dep. 103:9-23, 105:19-24.)

The plaintiff was not fingerprinted or handcuffed at the police headquarters.  The officers executed a Complaint Warrant charging the plaintiff with possession of a controlled dangerous substance ("CDS"), possession with intent to distribute cocaine, possession with intent to distribute cocaine in a school zone, attempting to flee from a police officer, aggravated assault of Muller, aggravated assault of Horvath, and unlawful possession of a knife, and bail was set at $150,000.  (Connell Cert., Ex. W, Complaint Warrant 1208-W-2006-136; Ex. X, Complaint Warrant 1208-W-2006-137.)  Horvath and Quinn transported the plaintiff to MCACC to be detained.  (Quinn's Answer to Pl.'s Interrog. No. 2.)

10

Upon arrival at MCACC, the plaintiff complained that the officers had beaten him, he had a bloody nose, he had neck and back injuries, and he needed medical attention.  (Riggins Dep. 104:3-105:24.)  MCACC refused to accept the plaintiff at that time, instructing Horvath and Quinn to take the plaintiff to a hospital.  (Connell Cert., Ex. HH, Horvath Aff. at ¶ 2; Quinn's Answer to Pl.'s Interrog. No. 2; Pl.'s Answer to Horvath's Interrog. No. 16.)

## III. Medical Treatment at Hospital

Horvath and Quinn took the plaintiff to a hospital for treatment.  (Horvath's Answer to Pl.'s Interrog. No. 12.)  The plaintiff was admitted at approximately 9:00 a.m. and discharged at about 2:30 p.m.  (Connell Cert., Ex. Q, Hospital Medical Records ("Medical Records") at 1.)

The hospital physician's notes indicate that the plaintiff complained to hospital personnel that "he was kicked and pushed and now has pain in neck from trauma. . . . complains of pain in head, neck, back, flank, abd[omen]."  (Id. at 2.)  According to the emergency room assessment form, indicators of the plaintiff's breathing, circulatory system, neurological status, abdomen, and extremities were all within normal limits.  (Id. at 18.)

The physician found "moderate tenderness of midline neck," but the plaintiff's shoulders and arms were not tender.  (Id.) The physician also observed that the plaintiff's condition

11

improved during the evaluation.  (Id. at 3.)  A CT scan of the
plaintiff's cervical spine showed congenital fusion of the C1 and
C2 vertebrae, but no evidence of fracture or sublaxation.  (Id.
at 17.)  X-rays of the chest and spine were negative.  The
physician diagnosed the plaintiff as having a neck strain and
prescribed ibuprofen.  (Id. at 9; Connell Cert., Ex. P, Riggins
Dep. 244:24-25.)

## IV.  Intake and Incarceration at MCACC

Upon his discharge from the hospital, the officers returned
the plaintiff to MCACC.  The plaintiff's MCACC intake forms,
completed at 2:45 p.m., indicate that the plaintiff was normal in
appearance and did not complain of any pain or injuries.
(Connell Cert., Ex. S, Receiving and Discharge Initial Screening
Form.)  A medical history and screening form completed by MCACC
medical personnel at 5:30 p.m. that evening indicates that the
plaintiff answered in the negative to both of the following
questions:  "Do you have a medical problem such as bleeding or
injuries that require immediate medical attention?" and, "Do you
have any medical problems we should know about?"  (Connell Cert.,
Ex. R, Medical History and Screening Form.)

The plaintiff filed a request for medical services on
November 16, 2006, complaining of severe headaches, back pain,
and blood in his urine.  (Connell Cert., Ex. R, Inmate Request

for Medical/Dental Services dated 11-16-06.)[6]  The plaintiff was given ibuprofen for pain, and a urinalysis performed that day showed blood in the urine.  During his incarceration at MCACC, the plaintiff sought medical services for back, neck, and side pain on several occasions.  (Connell Cert., Ex. R, Inmate Requests for Medical/Dental Services dated 5-12-08, 5-11-08, 12-6-07, 7-20-07.)

**V.   Resolution of the Events of 11-7-06**

Following the events of November 7, 2006, both Horvath and Muller filed a "Use of Force Report."  (Connell Cert., Exs. CC, DD.)  These reports reflect that the plaintiff resisted control and physically threatened or attacked the officers, that both officers utilized "compliance holds" in arresting the plaintiff, and that the suspect was taken to the hospital.  (Id.)  Muller's report reflects that he was injured.  (Id.; see also Muller's Answer to Pl.'s Interrog. No. 20.)

The plaintiff was indicted for seven crimes arising out of the events of November 7, 2006:  (1) third degree aggravated assault of Muller, N.J.S.A. § 2C:12-1b(5); (2) fourth degree

---

[6] The plaintiff's medical records indicate that he suffers from chronic hematuria, or red blood cells in the urine, the cause of which may also be responsible for pain in his side. (Connell Cert., Ex. R, 5-12-08 Inmate Request for Medical/Dental Services.)  A urinalysis performed on May 14, 2008, indicated a moderate presence of blood in the urine, just as a November 16, 2006 urinalysis showed a large presence of blood.  (Connell Cert., Ex. R, Urinalysis.)

aggravated assault of Horvath, N.J.S.A. § 2C:12-1b(5); (3)
possession with intent to distribute less than one half-ounce of
CDS, cocaine, N.J.S.A. §§ 2C:35-5b(1) and 2C:35-5b(3); (4)
possession of CDS, N.J.S.A. § 2C:35-10a(1); (5) possession of CDS
with intent to distribute on or near school property, N.J.S.A. §
2C:35-7; (6) obstructing the administration of law or other
governmental function, N.J.S.A. § 2C:29-1; and (7) unlawful
possession of a weapon, N.J.S.A. § 2C:39-5d.  (Indictment No. 07-
02-00282.)

At trial, the jury found Riggins not guilty as to Count 2,
aggravated assault of Horvath, and Count 7, unlawful possession
of a weapon.  Count 3, charging possession of CDS with intent to
distribute, and Count 5, charging possession of CDS with intent
to distribute on or near school property, were dismissed prior to
trial.  (Connell Cert., Ex. GG, 6-27-08 Judgment of Conviction.)
The jury convicted the plaintiff on the remaining counts.  The
trial court imposed a sentence of seven years on Count 1, five
years on Count 4, and one year, to be served concurrently with
Count 1, on Count 6.  (Id.)

### DISCUSSION

## I.  Plaintiff's Seventh Motion to Amend the Complaint

In his Seventh Motion to Amend, the plaintiff seeks to add
the following defendants to the action:  the Borough of
Jamesburg, Detective Louis Ceras, the Middlesex County Adult

14

Corrections Center, Sergeant Nick Lanier, Robert Bender, the plaintiff's trial counsel Richard Klein, the Middlesex County Prosecutor's Office, and Assistant Prosecutor Marcia Silva.  (7th Mot. to Amend at 1.)  He wishes to add claims pertaining to an alleged theft of the plaintiff's money during his arrest and pretrial detention, spoliation of evidence, conspiracy to steal the plaintiff's money against Horvath, Muller, and Ceras, malicious prosecution against Horvath, failure to train and supervise Horvath, Muller, Quinn, Ceras, and Klein against the borough of Jamesburg, failure to train and supervise Bender and Lanier against MCACC, legal malpractice against Klein, and prosecutorial misconduct against the Middlesex County Prosecutor's Office.  (7th Mot. to Amend at 2-5.)

The plaintiff contends that the amendment "is necessary to cause the complaint to conform to the newly discovered evidence." (Dkt. entry no. 92, Pl.'s Letter Mem. Supp. 7th Mot. to Amend at 1.)  Plaintiff further contends that the amendments should be permitted because the new claims relate back to his original Complaint, which named John Doe and Jane Doe Jamesburg officials. (Pl.'s Letter Mem. Supp. 7th Mot. to Amend at 7.)

Defendants contend, inter alia, that the plaintiff's Seventh Motion to Amend, dated June 1, 2009, and received by Muller's counsel by mail on June 8, 2009, is untimely and prejudicial to the defendants because discovery ended on April 21, 2009, and the

motion to amend was not made until after the defendants filed
their separate motions for summary judgment.  (Dkt. entry no. 94,
Defs.' Letter Br. Opp'n Pl.'s 7th Mot. to Amend at 2.)

    Courts "should freely give leave [to amend] when justice so
requires," Fed.R.Civ.P. 15(a)(2), and therefore may deny a
request to amend "only if the plaintiff's delay is undue,
motivated by bad faith, or prejudicial to the opposing party."
Bjorgung v. Whitetail Resort, LP, 550 F.3d 263, 266 (3d Cir.
2008).  A trial court also may deny leave to amend where
amendment would be futile because it would not withstand a future
motion to dismiss.  In re Burlington Coat Factory Sec. Litig.,
114 F.3d 1410, 1434 (3d Cir. 1997); Copland v. Grumet, 88
F.Supp.2d 326, 329 (D.N.J. 1999).[7]  The decision whether to grant
or deny a motion for leave to amend lies within the sound
discretion of the Court.  See Cureton v. Nat'l Collegiate
Athletic Ass'n, 252 F.3d 267, 272 (3d Cir. 2001).

    The plaintiff has already moved to add claims based on
"newly discovered evidence," i.e., documents produced in
discovery in this case.  (See dkt. entry no. 45, Pl.'s First Mot.
to Amend at ¶ 8, denied by dkt. entry no. 51, 1-26-09 Order; see

---

    [7] In order to survive a motion to dismiss pursuant to
Fed.R.Civ.P. 12(b)(6), a plaintiff must make factual allegations
sufficient to raise a right to relief that is "plausible on its
face," not merely "conceivable."  Bell Atl. Corp. v. Twombly, 550
U.S. 544, 545 (2007); see Phillips v. County of Allegheny, 515
F.3d 224, 234-35 (3d Cir. 2008).

<u>also</u> dkt. entry no. 92, Pl.'s Letter Mem. Supp. Amend Compl. at
1-2.)  The plaintiff's claims regarding the allegedly improper
seizure of money and related conspiracy, the alleged failure of
the Borough of Jamesburg to adequately train and supervise its
police department, the alleged liability of MCACC and its
employees Bender and Lanier for the seizure of the money, the
alleged malpractice of Klein, and the alleged misconduct of Silva
and the Middlesex Prosecutor's Office are not novel.  (<u>See</u> dkt.
entry no. 52, 2-17-09 Motion.)  The Magistrate Judge denied the
plaintiff's February 17, 2009, motion to amend, which raises the
same claims presented in the instant motion.  (Dkt. entry no. 56,
4-2-09 Order.)

     The plaintiff has also already argued that his proposed new
claims relate back to the original Complaint under Fed.R.Civ.P.
15(c).  (<u>See</u> dkt. entry nos. 60, 64, 65; 7th Mot. to Amend at ¶
7.)  The Magistrate Judge, noting that the plaintiff's additional
motions to amend the Complaint did not present any new
information, again denied the plaintiff's application for leave
to amend.  (Dkt. entry no. 67, 5-12-09 Order.)

     The plaintiff's Seventh Motion to Amend will be denied as
untimely and prejudicial to the defendants.  It raises no new
allegations, and the proposed claims have already been denied as
improperly presented or futile.  (<u>See</u> 4-2-09 and 5-12-09 Orders.)
It would be unfairly prejudicial to the defendants to allow the

proposed claims to proceed at this late stage in the litigation, months after discovery has been completed and summary judgment motions filed.  See Berry v. N.J. State Prison, No. 07-2284, 2009 WL 250269, at *2-*3 (D.N.J. Feb. 3, 2009); Warren v. Gelardi, No. 07-1266, 2009 WL 113450, at *6 (D.N.J. Jan. 14, 2009); McKenna v. City of Philadelphia, 511 F.Supp.2d 518, 527-28 (E.D. Pa. 2007). Moreover, the allegations against the proposed new defendants appear factually distinct from the plaintiff's claims in the original Complaint against John Doe and Jane Doe, unidentified Jamesburg police department employees whom the plaintiff alleged did nothing to stop an assault on the plaintiff while he was at the police headquarters.  (See Compl. at 3-4.)  Therefore, the new claims presented in the Seventh Motion to Amend do not relate back to the plaintiff's original pleadings against John Doe and Jane Doe because they do not "ar[i]se out of the conduct, transaction, or occurrence set out . . . in the original pleading."  Fed.R.Civ.P. 15(c)(1)(B).

## II.  Defendants' Separate Motions for Summary Judgment

### A.   Motion for Summary Judgment Standard

The standard for a motion for summary judgment is well-settled and will be briefly summarized here.  Rule 56(c) provides that summary judgment is proper if the pleadings, the discovery and disclosure materials, and any affidavits show that there is no genuine issue as to any material fact and that the movant is

entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c).  In making this determination, the Court must "view[] the record in the light most favorable to the non-moving party and draw[] all inferences in that party's favor."  United States ex rel. Josenske v. Carlisle HMA, Inc., 554 F.3d 88, 94 (3d Cir. 2009) (citing Abramson v. William Patterson Coll., 260 F.3d 265, 276 (3d Cir. 2001)).

**B.   Section 1983 Standard**

To state a claim under Section 1983, a plaintiff must allege:  (1) the violation of a right secured by the Constitution or laws of the United States, and (2) that the alleged deprivation was committed or caused by a person acting under color of state law.  West v. Atkins, 487 U.S. 42, 48 (1988); Piecknick v. Pennsylvania, 36 F.3d 1250, 1255-56 (3d Cir. 1994).

**C.   Qualified Immunity Standard**

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Pearson v. Callahan, 129 S.Ct. 808, 815 (2009) (citation omitted).  It is "an immunity from suit rather than a mere defense to liability."  Mitchell v. Forsyth, 472 U.S. 511, 526 (1985) (emphasis omitted).

Application of the doctrine involves a two-step analysis. First, a court must decide whether the facts that a plaintiff has shown make out a violation of a constitutional right.  Pearson, 129 S.Ct. at 815-16.  Second, the court must decide whether the right at issue was "clearly established" at the time of the defendant's alleged misconduct.  Id. at 816.  The order in which the Court addresses each step rests within the discretion of the Court "in light of the circumstances of the particular case at hand."  Id. at 818.

Government officials "are entitled to qualified immunity only if the Court can conclude, based on the undisputed facts in the record, that [the officials] reasonably, although perhaps mistakenly, believed that their conduct was lawful in light of the clearly established law and the information known to them at the time of the alleged constitutional violation."  Mantz v. Chain, 239 F.Supp.2d 486, 496  (D.N.J. 2002).  The burden of proving entitlement to qualified immunity rests with the defendants.  See Beers-Capitol v. Whetzel, 256 F.3d 120, 142 n.15 (3d Cir. 2001).

### III. Plaintiff's Claims under the Fourth and Fourteenth Amendments

The plaintiff's claims currently before the Court include his claim that Horvath and Muller subjected him to excessive force in effecting his arrest; his claim that Horvath, Muller, and Quinn subjected him to excessive force while he was in a

holding cell at the Jamesburg police headquarters; and his claim
that Horvath, Muller, and Quinn denied him medical care for the
injuries they inflicted upon him.  The Court addresses these
claims seriatim.

### A.    Pre-Custody Excessive Force Claim

#### 1.  Fourth Amendment Claim Against Muller

The Court cannot reach the merits of the plaintiff's claim
that Muller used excessive force in arresting him, because

> in order to recover damages for allegedly
> unconstitutional conviction or imprisonment, or for
> other harm caused by actions whose unlawfulness would
> render a conviction or sentence invalid, a § 1983
> plaintiff must prove that the conviction or sentence
> has been reversed on direct appeal, expunged by
> executive order, declared invalid by a state tribunal
> authorized to make such determination, or called into
> question by a federal court's issuance of a writ of
> habeas corpus, 28 U.S.C. § 2254.  A claim for damages
> bearing that relationship to a conviction or sentence
> that has not been so invalidated is not cognizable
> under § 1983.  Thus, when a state prisoner seeks
> damages in a § 1983 suit, the district court must
> consider whether a judgment in favor of the plaintiff
> would necessarily imply the invalidity of his
> conviction or sentence; if it would, the complaint must
> be dismissed unless the plaintiff can demonstrate that
> the conviction or sentence has already been
> invalidated.

Heck, 512 U.S. at 486-87 (footnote omitted).  Heck renders the
plaintiff's Fourth Amendment claim against Muller incognizable.

A finding that Muller used excessive force in effecting the
plaintiff's arrest, in violation of the Fourth Amendment, would
call into question the plaintiff's conviction for aggravated
assault of Muller.  See, e.g., Jennings v. Fetterman, 197

Fed.Appx. 162, 165 (3d Cir. 2006) (affirming district court's
reasoning that the fact of conviction of attempted homicide
necessarily meant that the jury had rejected the plaintiff's
theory that he had shot at the arresting officer in self
defense); Smith v. Mitchell, No. 97-6115, 2000 WL 33256676, at *3
(D.N.J. Nov. 21, 2000) (noting that because self-defense is a
defense to the charge of aggravated assault, a criminal defendant
could not be found guilty of assault unless he or she used an
amount of force greater than the amount of force used by the
officer allegedly using excessive force).

The plaintiff has not shown that his conviction for
aggravated assault of Muller has been invalidated or otherwise
called into question.  Thus, the Court must dismiss the
plaintiff's Fourth Amendment excessive force claim against Muller
because it lacks jurisdiction under Heck to enter judgment in
favor of Muller.  See Smith, 2000 WL 33256676, at *1 n.1.  The
Court will dismiss this claim without prejudice, in the event
that the plaintiff is later able to show that the conviction has
been called into question in a successful petition for a writ of
habeas corpus.  Id.

### 2.  Fourth Amendment Claim Against Horvath

The plaintiff's claim that Horvath subjected him to
excessive force in effecting his arrest is governed by the Fourth
Amendment's prohibition against unreasonable seizures of the

22

person.  See Tennessee v. Garner, 471 U.S. 1, 7-22 (1985).  The
threshold inquiry in an excessive force claim is "whether the
officers' actions are 'objectively reasonable' in light of the
facts and circumstances confronting them, without regard to their
underlying intent or motivations."  Graham v. Connor, 490 U.S.
386, 397 (1989) (citation omitted).

Whether an officer's actions are objectively reasonable
depends on the totality of the circumstances of a particular
case, including the severity of the crime at issue, whether the
suspect poses a threat to the safety of the officers or others,
and whether he is actively resisting arrest or attempting to
evade arrest by flight.  Id. at 396.  Other factors to consider
include the possibility that the suspect is violent, the duration
of the police action, whether the police action takes place in
the context of effecting an arrest, and the possibility that the
suspect may be armed.  See Sharrar v. Felsing, 128 F.3d 810, 822
(3d Cir. 1997), abrogated on other grounds, Curley v. Klem, 499
F.3d 199 (3d Cir. 2007).  The absence of serious physical injury
does not necessarily signify that the force used was not
excessive.  Sharrar, 128 F.3d at 822.

The interaction between Horvath and the plaintiff occurred
as a result of the plaintiff's running from Muller, who attempted
to question the plaintiff in the course of investigating the
resident's report of a suspicious person.  During the chase, the

23

officers knew that the plaintiff was armed because the plaintiff had told Muller that he had a work knife on him.  (Riggins Dep. 226:13-227:11.)  The plaintiff does not dispute that he fled and resisted the officers' attempts to apprehend him.  See supra n.5. When the plaintiff ran from Muller during the course of investigatory questioning, probable cause existed to arrest the plaintiff for obstructing administration of law.  See N.J.S.A. § 2C:29-1 ("A person commits an offense if he purposely obstructs, impairs or perverts the administration of law . . . or prevents or attempts to prevent a public servant from lawfully performing an official function by means of flight, intimidation, force, violence, or physical interference. . . .").

The plaintiff then disregarded Horvath and Muller's commands to stop running away, and initiated a foot chase through the backyards of two residential properties.  The chase ended only when the plaintiff attempted to run through a row of hedges and got caught up in them.  (Riggins Dep. 118:20-22, 119:23-120:6; Resident Aff. at ¶¶ 21-22 (stating that the plaintiff was apprehended when he bounced back from the hedges and Horvath grabbed him and took him to the ground).)  The plaintiff resisted arrest by kicking at the officers and struggling to avoid being handcuffed.  (Resident Aff. at ¶ 26.)

In light of the plaintiff's attempt to flee, possible danger to the safety of the officers and others in the neighborhood, and

24

length of the chase and apprehension, it was reasonable for
Horvath to use some force against the plaintiff as a means of
apprehending and handcuffing him.  See Graham, 490 U.S. at 396
("Fourth Amendment jurisprudence has long recognized that the
right to make an arrest or investigatory stop necessarily carries
with it the right to use some degree of physical coercion or
threat thereof to effect it.").

The plaintiff testified in sworn deposition testimony,
however, that Horvath and Muller not only used force in
attempting to handcuff him for thirty seconds after apprehending
him and taking him to the ground, but continued their alleged
assault for approximately three minutes after the plaintiff was
handcuffed.  (Riggins Dep. 129:11-22, 131:4-23.)  The plaintiff
also contends that while he was handcuffed, Horvath slammed his
head into the door of the car when placing him in a patrol car.
(Riggins Dep. 106:15-107:9.)  Although the plaintiff's testimony
is not consistent with the officers' or the resident's version of
events, a reasonable jury could find that, once handcuffed, the
plaintiff no longer posed a threat to the officers or anyone
else, and that any continued assault by the officers constituted
"more force than . . . necessary to arrest him."  Thomas v. City
of Erie, 236 Fed.Appx. 772, 776 (3d Cir. 2007).  This discrepancy
raises a genuine issue of material fact as to the reasonableness
of the nature and duration of Horvath's use of force against the

plaintiff after successfully handcuffing the plaintiff.  See
Ference, 538 F.Supp.2d at 806 (finding evidence sufficient to
raise a material issue of fact as to whether the defendant used
excessive force against the plaintiff "subsequent to, but not
before, he was placed under arrest").

In such a circumstance, the Court cannot find at the summary
judgment stage that Horvath is entitled to qualified immunity,
because it is clearly established that the use of force greater
than objectively reasonable violates the Fourth Amendment.  See
Vasquez v. City of Jersey City, No. 03-5369, 2006 WL 1098171, at
*4-*5 (D.N.J. Mar. 31, 2006).  Accordingly, Horvath's motion for
summary judgment will be denied as to the plaintiff's claim that
Horvath used excessive force in arresting him.

### B. Post-Custody Excessive Force Claim Against Horvath, Muller, and Quinn

#### 1. Applicable Legal Standard

"[T]he Due Process Clause [of the Fourteenth Amendment]
protects a pretrial detainee from the use of excessive force that
amounts to punishment."  Graham, 490 U.S. at 395 n.10 (citing
Bell v. Wolfish, 441 U.S. 520, 535-539 (1979)).  However, the
question of when an arrestee subject to the Fourth Amendment's
protections becomes a pretrial detainee subject to the
protections of the Fourteenth Amendment is unsettled.  See
Warren, 2009 WL 113450, at *8; see also Graham, 490 U.S. at 395
n.10 ("Our cases have not resolved the question whether the

26

Fourth Amendment continues to provide individuals with protection against the deliberate use of excessive physical force beyond the point at which arrest ends and pretrial detention begins, and we do not attempt to answer that question today.").

In Hill v. Algor, 85 F.Supp.2d 391, 401-402 (D.N.J. 2000), a Section 1983 plaintiff alleged that the defendant state troopers used excessive force in effecting his arrest and in assaulting him at the police barracks while awaiting release.  The court analyzed the plaintiff's claim that the state troopers used excessive force in handcuffing him to a bench in his holding cell and hitting him with their flashlights and walkie-talkies under the Fourth Amendment, rather than the Fourteenth Amendment as urged by the defendants.  Id. at 401-03.  The Hill court observed that "[t]he standard for § 1983 excessive force claims governed by the Fourteenth Amendment–that the officer's conduct 'shock the conscience'–is much higher than the 'objective reasonableness' standard imposed by the Fourth Amendment."  Id. at 401.  Noting that "where the seizure ends and pre-trial detention begins is a difficult question," Torres v. McLaughlin, 163 F.3d 169, 174 (3d Cir. 1998) (internal quotation omitted), the Hill court concluded that "a person continues to be an arrestee subject to Fourth Amendment protection through the period of post-arrest but prearraignment detention. . . . [Pretrial detention] does not begin until an arrestee is at least formally charged and his

27

release or continued detainment is determined."  Hill, 85
F.Supp.2d at 402 n.7, 403.

The plaintiff's first appearance in his criminal case was
scheduled for November 21, 2006.  (Complaint-Warrant Nos. 1208-W-
2006-000136, 1208-W-2006-000187.)  The plaintiff's arraignment,
at which he pleaded not guilty, occurred on March 19, 2007.  (6-
27-07 Judgment of Conviction.)  Thus, the Court considers the
plaintiff's excessive force claim against Horvath, Muller, and
Quinn for the alleged attempted strip search in a holding cell at
police headquarters under the same Fourth Amendment
reasonableness standard applicable to the earlier phase of the
plaintiff's arrest, rather than the Fourteenth Amendment "shock
the conscience" standard applicable to pretrial detainees.  Cf.
United States v. Johnstone, 107 F.3d 200, 205-06 (3d Cir. 1997)
(applying Fourth Amendment reasonableness standard to claims of
excessive force both before and after handcuffing plaintiff and
placing him in police car, including alleged assault that
occurred in police station garage, as "occurr[ing] during the
course of [plaintiff's] arrest.").

The Court first considers whether the officers would have
been justified in attempting such a search at its inception.
Next, the Court considers the plaintiff's claims that the
officers attacked him when he resisted.

28

## 2.   Legality of Alleged Strip Search

In Bell v. Wolfish, the Supreme Court considered the
question of whether a blanket policy requiring strip searches of
pretrial detainees after each contact visit from an outside
visitor contravened the Fourth Amendment.  441 U.S. at 558-60.
The Court determined that convicted prisoners and pretrial
detainees "retain some Fourth Amendment rights upon commitment to
a corrections facility."  Id. at 558.  The Court then held that
in order to determine whether the policy was constitutional, it
must balance "the need for the particular search against the
invasion of personal rights that the search entails" by
considering "the scope of the particular intrusion, the manner in
which it is conducted, the justification for initiating it, and
the place in which it is conducted."  Id. at 558-59.  Upholding
the constitutionality of the policy, the Court concluded that the
goal of detecting and deterring the presence of contraband in the
correctional facility allowed officials to conduct strip searches
on less than probable cause.  Id. at 560.

Courts in this District have held, relying on Bell for
guidance, that "for a strip search to be constitutional there
must be reasonable suspicion that the arrestee is concealing
weapons or contraband; such suspicion could arise either from the
specific circumstances of the arrestee or the arrest, or from the
nature of the offense charged."  DiLoreto v. Borough of Oaklyn,

744 F.Supp. 610, 620 (D.N.J. 1990); <u>see also</u> <u>Davis v. City of</u>
<u>Camden</u>, 657 F.Supp. 396, 400-401 (D.N.J. 1987).  Courts apply
this standard to body cavity searches of arrestees as well as
"visual" strip searches.  <u>See</u> <u>O'Brien v. Borough of Woodbury</u>
<u>Heights</u>, 679 F.Supp. 429, 433-34 (D.N.J. 1988).

Because the plaintiff was charged with several drug
offenses, and the arresting officers found cocaine in the
plaintiff's possession when effecting his arrest, the officers
had reasonable suspicion to strip search the plaintiff at the
Jamesburg police headquarters in order to determine if the
plaintiff was concealing any additional drugs.  <u>See</u> <u>Roberts v.</u>
<u>Gillikin</u>, No. 06-88, 2007 WL 2066382, at *3 (D.N.J. July 13,
2007) (holding that police officer had reasonable suspicion to
conduct strip search at police station of arrestee who had been
arrested for possession of CDS).  Even accepting as true the
plaintiff's contention that the defendants attempted a body
cavity or strip search, it did not contravene the Fourth
Amendment for them to do so.

**3.  Legality of Force Used in Effecting Strip Search**

By the plaintiff's own admission, the defendants' alleged
assault in the holding cell at the Jamesburg police headquarters
occurred when he resisted the attempted body cavity search.
(Pl.'s Answers to Horvath's Interrogs. Nos. 5, 7 ("Plaintiff
resisted these Defendant's efforts to go searching inside his

anal area. . . . Plaintiff was fearful of being sodomized by
Martin Horvath:  did in fact put up a struggle.").)  The
plaintiff contends that the defendants twisted his limbs and
stomped him during the struggle, but his medical records contain
no evidence of injuries caused by stomping or twisting.  (Pl.'s
Answer to Muller's Interrog. No. 12; Pl.'s Answer to Horvath's
Interrog. No. 10; Medical Records at 2, 9.)

Under the Fourth Amendment's reasonableness standard, the
defendants were entitled to use some degree of force to subdue
the agitated plaintiff.  See Graham, 490 U.S. at 396.  Unlike
Horvath and Muller's pre-custodial use of force, no evidence
suggests that the plaintiff became subdued so that any continued
use of force was inappropriate.  The plaintiff's conclusory
statement that "Martin Horvath, Jason Muller and Joseph Quinn had
no cause to use force on Plaintiff at police headquarters after
Plaintiff had been in custody in a holding cell" is simply
incorrect.  (Pl.'s Aff. at ¶ 27.)  Because the plaintiff resisted
the strip search, which was reasonable under the circumstances,
the undisputed record does not support the plaintiff's claim that
Horvath, Muller, and Quinn subjected him to excessive force at
the Jamesburg police headquarters.  Cf. Lawrence v. Tierney, No.
06-5316, 2009 WL 2905456, at *3 (D.N.J. Sept. 9, 2009) (granting
summary judgment to defendant officers where the record
established that the plaintiff was lawfully stopped and the

plaintiff resisted arrest, necessitating the use of force to restrain the plaintiff).

The defendants are entitled to qualified immunity on this claim.  The Court will grant each of the defendants' separate motions for summary judgment as to the plaintiff's allegations of excessive force at the Jamesburg police headquarters.

### C.  Fourteenth Amendment Denial of Medical Care Claim

The Due Process Clause of the Fourteenth Amendment requires "the responsible government or governmental agency to provide medical care to persons . . . who have been injured while being apprehended by the police."  City of Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244 (1983).  A pretrial detainee's right to medical care under the Due Process Clause is analyzed under the same standard as a convicted prisoner's right to medical care under the Eighth Amendment.  Natale v. Camden County Corr. Facility, 318 F.3d 575, 581 (3d Cir. 2003); see also Bell, 441 U.S. at 537 n.16.  The Eighth Amendment's proscription against cruel and unusual punishment requires that prison officials provide inmates with adequate medical care.  Estelle v. Gamble, 429 U.S. 97, 103-04 (1976).

In order to prevail on a claim of denial of medical care, a plaintiff must make a two-part showing:  (1) the existence of a serious medical need, and (2) behavior on the part of the

defendant officials that constitutes deliberate indifference to that need. Id. at 106.

The plaintiff first must demonstrate that his medical needs are serious. See Hudson v. McMillian, 503 U.S. 1, 9 (1992). Serious medical needs include those that have been diagnosed by a physician as requiring treatment or are so obvious that a lay person would recognize the necessity for doctor's attention, and those conditions which, if left untreated, would result in lifelong handicap or permanent loss. Monmouth County Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987). Factors to consider in this analysis include the severity of the medical problems, the potential for harm if the medical care is denied or delayed, and whether any such harm actually resulted from the lack of medical attention. Maldonado v. Terhune, 28 F.Supp.2d 284, 289 (D.N.J. 1998).

The plaintiff then must show that the defendant officers acted with deliberate indifference to his serious medical need. "Deliberate indifference" is more than mere malpractice or negligence; it is a state of mind equivalent to reckless disregard of a known risk of harm. Farmer v. Brennan, 511 U.S. 825, 837-38 (1994).

Where, as here, the plaintiff alleges only a delay in obtaining medical assistance and not an outright denial of medical care, "the objective seriousness of the deprivation

33

should . . . be measured by reference to the effect of the delay
in treatment." <u>Mantz</u>, 239 F.Supp.2d at 504 (internal quotations
omitted).  The plaintiff does not contend, and has presented no
evidence showing, that the three- to four-hour delay from the
time of his arrest to the time of his admission to the hospital
"caused him to suffer harm which he would not have suffered" had
medical attention been immediately provided.  <u>Id.</u>  Rather, the
plaintiff was diagnosed with a neck strain and prescribed
ibuprofen for his discomfort.  Nothing in the plaintiff's medical
records indicates that any delay in treatment exacerbated his
injury.

The defendants are entitled to qualified immunity on this
claim.  The Court will grant each of the defendants' separate
motions for summary judgment as to the plaintiff's allegations of
denial of medical care.

**CONCLUSION**

The Court, for the reasons stated <u>supra</u>, will (1) deny the
plaintiff's Seventh Motion to Amend, (2) dismiss without
prejudice the plaintiff's Fourth Amendment excessive force claim
against Muller pursuant to <u>Heck v. Humphrey</u>, 512 U.S. 477 (1994),
(3) deny Horvath's motion for summary judgment as to the
plaintiff's claim that Horvath used excessive force in effecting
the plaintiff's arrest, and (4) grant the defendants' separate
motions for summary judgment as to the plaintiff's claims that

the defendants assaulted him at the Jamesburg police headquarters and denied his requests for medical care.  The Court will issue an appropriate order and judgment.


                                                 s/ Mary L. Cooper
                                          **MARY L. COOPER**
                                          United States District Judge

Dated:    September 28, 2009